**Jerome I. FELDMAN and Martin M. Pollack, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,**

v.

**PIONEER PETROLEUM, INC.; Frontier Corporation; the Estate of William D. Bradford; Fidelity Bank, N.A.; and Alice June Harris, Defendants-Appellees.**

**Securities and Exchange Commission; Norman C. Cross, Jr., and Cross & Company, Amici Curiae.**

No. 85–1432.

United States Court of Appeals, Tenth Circuit.

March 5, 1987.

Edward Labaton (Linda Nussbaum, John H. Riley of Goodkind, Wechsler, Labaton & Rudoff, New York City, and R.C. Jopling of Jopling & Blankenship, Oklahoma City, Okl., with him on the briefs) of Goodkind, Wechsler, Labaton & Rudoff, New York City, for plaintiffs-appellants.

B.J. Rothbaum, Jr. (Brinda K. White, with him on the brief) of Linn & Helms,

Oklahoma City, Okl., for defendant-appellee Fidelity Bank, N.A.

Burck Bailey, Fellers Snider Blankenship Bailey & Tippens, Oklahoma City, Okl., for defendant-appellee Alice June Harris.

Daniel D. Boland of Hartzog, Conger & Cason, Oklahoma City, Okl., filed a brief for defendants-appellees Pioneer Petroleum, Inc. and Estate of William D. Bradford.

Richard Kirby, Asst. General Counsel (Daniel Goelzer, General Counsel, Jacob Stillman, Associate General Counsel, Marcha McNeely, Atty., and Paul Gonson, Solicitor, with him on the brief), S.E.C., Washington, D.C., for amicus curiae U.S. S.E.C.

B. Hayden Crawford (Mary N. Birmingham, Tulsa, Okl., with him on the brief) of Crawford, Crowe & Bainbridge, P.A., Tulsa, Okl., for amici curiae Norman C. Cross, Jr. and Cross & Co.

Before BARRETT and TACHA, Circuit Judges, and BROWN, District Judge.[*]

WESLEY E. BROWN, Senior District Judge.

Plaintiffs appeal from a judgment entered pursuant to an order of the District Court, sitting without a jury, which granted defendants' Rule 41(b) motion for involuntary dismissal at the close of plaintiffs' case-in-chief on their federal securities fraud claims as well as the related common law fraud claims. Plaintiffs Jerome Feldman, Harvey Kushner, and Martin Pollack brought this private damage suit as a class action on behalf of themselves and all other similarly situated investors who had invested during 1972 in a number of related limited partnerships designed to engage in the exploration for and production of oil and gas in the State of Oklahoma. In their complaint, plaintiffs charged that defendants [1] had violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), Securities and Exchange Com-

mission Rule 10b–5, 17 C.F.R. Sec. 240.10b–5, and common law principles of fraud. Plaintiffs sought legal damages or in the alternative rescission and restitution.

Initially, the District Court determined that the plaintiffs' suit could be maintained as a class action. The class, however, was subsequently decertified. The putative class members who had acquired similar interests in the limited partnerships were allowed to intervene. At a pre-trial conference, counsel agreed to a set of trial procedures which allowed the parties to try this litigation as if it were a class action. Both sides agreed that plaintiffs were to select several investors whose claims were representative of the various groups of investors and that they were to present their claims in their entirety. ROA, Vol. VIII, at 2580. At the conclusion of the plaintiffs' case-in-chief, the District Court would consider any appropriate motions by defendants for involuntary dismissal of the plaintiffs' claims on their merits under Rule 41(b), F.R.Civ.P. Plaintiffs Jerome Feldman, Barry Brookstein, Albert Abraham, and Albert Rettig were selected as representatives of the various groups of investors. Counsel for plaintiffs also stipulated at the close of the plaintiffs' case-in-chief that an adverse ruling by the District Court on the merits of the claims of these four "test" plaintiffs also applied to the remaining plaintiffs. ROA, Vol. XXVIII at 878–886.

The District Court sustained the defendants' motion to dismiss under Rule 41(b), F.R.Civ.P., in an order reported in 606 F.Supp. 916 (1985). The District Court found that the plaintiffs were aware of, but had failed to preserve their claims diligently in the probate proceedings on The Estate of Harris in an Oklahoma state probate court. The District Court dismissed the plaintiffs' claims against The Estate of Harris because it concluded that the state probate court had entered a "final order adjudicating the rights of all parties having

---

[*] Honorable Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation.

[1]. Defendants were: Pioneer Petroleum, Inc., Frontier Corp., The Estate of William D. Bradford, John H. Burgher, Fidelity Bank, N.A., The Estate of Grady Harris, Arthur Young & Company and James Houghton. Plaintiffs dismissed John H. Burgher as a defendant during the trial.

or seeking an interest in such Estate." 606 F.Supp. at 920. The District Court declined to consider the remedy of rescission and restitution, finding that the plaintiffs had not acted "with all reasonable dispatch to preserve this remedy." *Id.*, at 923. The District Court also found that the plaintiffs failed to present any evidence to support their claims for out-of-pocket damages. *Id.*, at 923–24 & n. 5. It dismissed the plaintiffs' claims against the defendants-appellees, concluding that such a lack of proof on damages was "dispositive of the present action in its entirety." *Id.*, at 924.

For reversal, plaintiffs have assigned four errors for review.[2] First, the District Court erred in applying an inappropriate legal standard in determining damages in a Rule 10b–5 case. Second, the District Court erred in rejecting their alternative claim for the equitable remedy of rescission and restitution. Third, the District Court erred in concluding that a final probate court order barred the plaintiffs from asserting their claims against The Estate of Harris in this action. Fourth, the District Court erred in decertifying the class.

■ Because this appeal arises from a final order of dismissal under Rule 41(b), F.R.Civ.P., we believe that the plaintiffs have erroneously focused their contentions upon their view that the District Court entered a finding on the liability issue in their favor.[3] Rule 41(b), F.R.Civ.P., provides, in pertinent part, that

(a)fter the plaintiff, in an action tried by the court sitting without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).

The purpose of Rule 41(b) is to permit a defendant to move for judgment in his favor "when the district court, even before hearing the defendant's evidence, determines that the plaintiff has failed to offer persuasive evidence regarding the necessary elements of his case." *duPont v. Southern National Bank of Houston*, 771 F.2d 874, 879 (5th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1467, 89 L.Ed.2d 723 (1986). It is clear that Rule 41(b) allows a district court to "dismiss the plaintiff's claim but does not allow it to render judgment in favor of the plaintiff." *Id.* The question we find dispositive in reviewing this appeal from a final order dismissing the plaintiffs' claims on their merits is whether or not the District Court erred in finding that the plaintiffs failed to prove all of the necessary elements under the federal securities law and common law fraud principles.[4] We agree with the District Court that the record discloses that the plaintiffs offered no competent evidence throughout the eight-day bench trial of their case in its entirety to satisfy the

---

**2.** Plaintiffs did not appeal the dismissal as to defendants Arthur Young & Company and James Houghton.

**3.** Plaintiffs argue that counsel for the defendant Fidelity Bank stated to the District Court that Fidelity Bank would waive its right to present evidence even though the District Court denied the defendants' Rule 41(b) motion to dismiss. ROA, Vol. XXVIII, at 886–887. Under the posture of this litigation, after the District Court granted the defendants' Rule 41(b) motion at the close of the plaintiffs' case-in-chief, it is immaterial to argue whether or not any additional evidence offered by the defendant would affect the District Court's decision in entering a judgment for Fidelity Bank.

**4.** In deciding a Rule 41(b) motion which calls for an adjudication upon the merits of the plaintiff's claim, the district court undertakes the fact finding process which involves a weighing of the evidence and an assessment of the credibility of the witnesses to determine whether or not the plaintiff has demonstrated a factual and legal "right to relief." On review of a district court's grant of a Rule 41(b) motion, we examine the propriety of the court's factual findings under the "clearly erroneous" standard. *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 436 (10th Cir.), *cert. denied,* 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983).

burden of proving their claims for damages. We affirm.

We will set out those substantially uncontroverted facts, as found by the District Court, which are essential to an understanding of our decision on the dispositive question before us. In 1972, William D. Bradford, who died before the trial, and John Burgher organized, promoted and sold limited partnership interests for the purpose of exploration for and development of oil and gas from leaseholds located within the State of Oklahoma. Under the plan of operation, as described in a prospectus document entitled "Confidential Memorandum—William D. Bradford Partnership," each partnership would consist of Bradford as the sole general partner and a number of limited partners who invested in that partnership. Each partnership was to be divided into two tiers—a first-tier partnership and a second-tier partnership. The limited partners' investment in the first-tier would consist of the capital investment of the limited partners. It would be used to purchase from Pioneer Petroleum, Inc., a working interest in an oil and gas lease and to cover Pioneer's costs of drilling oil and water injection wells, purchase of equipment, and other expenses under an operating agreement in which Pioneer agreed to drill all wells on a turnkey basis.[5] Approximately 90% of the capital contributed by the limited partners would be allocated to "intangible drilling and development costs." This would provide the basis for each limited partner to claim a deduction of 90% on his investment for income tax purposes. When it was established that the leasehold involved in the first-tier partnership had an economic value, the general partner would arrange to finance further development by selling on a non-recourse basis a carved-out production payment

("COPP"), payable out of 100% of the oil and gas revenues from the first-tier partnership's working interest in that leasehold, to an outside lending source for a price approximately equal to the total capital contribution in the first-tier partnership. For tax purposes, the sale of the COPP would be analogus to a non-recourse mortgage (loan). At the option of the limited partner, the COPP loan funds received by the partnership would be used by the general partner as the limited partner's investment in a second-tier partnership involving the same general and limited partners as the first-tier partnership. The capital supplied to the second-tier partnership by the COPP loan funds would then be used to obtain working interests and operating agreements from Pioneer in connection with additional oil and gas leases. The limited partners participating in both the first- and second-tier partnerships would have a basis to claim another tax deduction of approximately 90% of its initial investment as expenses and intangible drilling and development costs involved in the development of the lease acquired by the second-tier partnership. Under the Bradford Plan, a limited partner participating in both tiers of the Bradford Partnerships would thus be able to claim deductions equivalent to about 180% of his initial investment.[6]

The gravamen of plaintiffs' claims was the assertion that the representations made to the prospective investors were false and misleading in respect both to the availability of bona fide COPP loans from an outside lending institution and the legality of the investments to be used as a tax shelter. Specifically, plaintiffs alleged that material misrepresentations were made by William D. Bradford, John H. Burgher, James L. Houghton, and Grady D. Harris[7] to induce

---

**5.** A turnkey contract was explained as an agreement which "would normally state a single amount as being the consideration for the performance of drilling to some specific stage, either to the point of setting production casing or, in some instances, through completion to the tanks." ROA Vol. XXIII at 301.

**6.** As an example, the District Court illustrated that a limited partner who invested $10,000 in

the first-tier partnership and elected to participate in the second-tier, the investor would have a basis to claim a tax deduction on its initial investment in the amount of $18,000 for income tax purposes. *Feldman, supra,* at 918.

**7.** Grady D. Harris died in August 1974 before this suit was filed. Plaintiffs sued his Estate in this case filed in 1976.

the investors to purchase the Bradford Partnership, and that as a result of their reliance on the misrepresentations they sustained damages. Plaintiffs also alleged that Fidelity Bank, N.A. and its president Grady D. Harris aided and abetted in a conspiracy to promote the scheme by engaging in a fraudulent and deceptive transaction to create the false appearance to prospective investors that the Bradford Partnerships could and would obtain the COPP loans from Fidelity Bank.

Each of the four "test" plaintiffs deducted 180% of his Bradford investment in the Federal income tax returns. In 1975, the Internal Revenue Service conducted a review of the Bradford Partnerships. It found that the manner in which the second-tier partnerships were structured as a tax shelter was a "sham," and recommended that a disallowance of each of the plaintiffs' deductions on the second-tier of the programs. While the IRS is disputing the view taken by the investors that their deductions on the second-tier investment were legitimate, the record before us discloses that none of the investors, including the "test" plaintiffs, have been required to pay any additional taxes with respect to their 1972 Federal income tax returns. Indeed, the IRS has attempted to settle with the investors of the Bradford partnership programs by designating the unresolved tax disputes as "settlement vehicles." This means that each investor can claim a deduction of 100% on the actual amount of his investment. There is evidence in the record which shows that some of the investors have resolved their tax disputes with the IRS on this basis.

■ The District Court properly set out the elements essential to the establishment of a private cause of action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), Rule 10b–5 issued thereunder, 17 C.F.R. Sec. 240.10b–5.[8] A plaintiff has the burden of proving every element of his Rule 10b–5 anti-fraud action, including damages. The law on damages generally does not require a plaintiff to establish "the quantum of damages 'with mathematical precision,'" but there must be sufficient evidence introduced by the plaintiff to provide a trier of facts with an intelligent means in determining an appropriate damages award without speculation or conjecture. *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1158 (10th Cir.1981). Although neither Section 10(b) of the Act nor Rule 10b–5 contains explicit provisions for determining damages, courts have applied the "actual damages" standard of Section 28 of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78bb(a),[9] to Rule 10b–5 claims.[10] Under Section 28 of the Act, the

**8.** Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), provides that "(i)t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—(b) To use or employ, in connection with the purchase of sale of any security registered on a national exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 of the Securities and Exchange Commission Rules, 17 C.F.R. Sec. 240.10b–5, provides that "(i)t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

**9.** Section 28 of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78bb(a) provides in pertinent part that "(t)he rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of."

**10.** The Supreme Court in *Randall v. Loftsgaarden*, 478 U.S. ——, 106 S.Ct. 3143, 3152, 3155, 92 L.Ed.2d 525 (1986), declined to decide the "issue whether and under what circumstances re-

"correct measure of damages ... is the difference between the fair value of all that the (plaintiff) received and the fair value of what he would have received had there been no fraudulent conduct." *Randall v. Loftsgaarden,* 478 U.S. ——, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986) (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972)).

▮ The failure to show actual damages is a fatal defect in a Rule 10b–5 cause of action. *Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F.2d 527, 533 (10th Cir.1962). Upon a careful examination of the record, we agree with the District Court's finding that the record discloses that plaintiffs had ample opportunity, but simply failed to adduce proof on the amount of actual damages, if any, they allegedly sustained in the investment of the Bradford partnership programs as a result of their reliance on the fraudulent conduct by the defendants. *See Feldman, supra,* 606 F.Supp. 916, 924 n. 5.[11] We need not engage in a lengthy discussion on the plaintiffs' contention that the District Court applied the erroneous legal standard in determining damages in this Rule 10b–5 action by following the "tax benefit offset rule" announced in *Austin v. Loftsgaarden, (August II)* 768 F.2d 949 (8th Cir.1985) (en banc), affirming *Austin I,* 675 F.2d 168, 181 (8th Cir.1982). The *en banc Austin II* decision was subsequently reversed by the Supreme Court in a decision issued approximately two months prior to the oral argument in this appeal. The Court in *Randall v. Loftsgaarden, supra,* held that the measure of damages in an action brought under Section 10(b) of the Securities Exchange Act of 1934 should not be reduced by tax benefits received by a defrauded investor in a tax shelter program. 106 S.Ct. at 3153. Even if the District Court had the benefit of the guidance provided in the *Randall* decision, we believe that an application of the decisional law under *Randall* to the factual finding by the District Court that plaintiffs failed to establish a factual and legal right to relief would not change its ultimate conclusion in granting defendants' Rule 41(b) motion to dismiss plaintiffs' claim asserted under Rule 10b–5 and state common law fraud principles.[12] Our decision in affirming the District Court's order of dismissal upon its finding and conclusion that plaintiffs failed to meet their burden of proving all of the requisite elements of their causes of action also applies to their claims asserted against the defendant, The Estate of Harris. We therefore need not consider

scission or a rescissory measure of damages is available" in a Rule 10b–5 action. However, it noted that a lower court in *Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir.1975), decided that "it is within the discretion of the district judge in appropriate circumstances to apply a rescissory measure." 106 S.Ct. at 3153. The case law in our Circuit requires that the plaintiff must act promptly in seeking a rescissionary measure of damages as soon as he learned or had reason to put him on notice of the fraud, or he waives his right to rescind. *Estate Counseling Service Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F.2d 527, 532 (10th Cir.1962). We are not persuaded that the District Court improperly refused to consider the plaintiffs' alternative remedy of rescission upon a finding that plaintiffs waited nearly two years to assert this equitable relief after they had "information sufficiently suggestive of the alleged fraud" by the defendants. *Feldman, supra,* 606 F.Supp. at 923.

**11.** The District Court stated that "as early as December 31, 1980 this Court indicated its willingness to consider damages based on the value difference between the investment purchased and the price paid." *See* ROA, Vol. VI at 1723–1725. The District Court, however, found that "no expert testimony was introduced (by plaintiffs) positing such valuation." *Feldman,* 606 F.Supp. at 924 n. 5. Plaintiffs have submitted an attachment to their opening brief, entitled "Compilation of Damages of Various Plaintiffs," which purports to show the amount of damages allegedly sustained by each plaintiff who had resolved his tax dispute with the IRS. Plaintiffs provide no citation of this attachment to the trial record, and we find no reference in the record that the contents of this attachment were properly introduced into evidence during the trial. We deem it inappropriate to consider evidentiary matters which were not presented to and passed upon by the District Court in the first instance.

**12.** *Cf.* The District Court also concluded that "the Plaintiffs have failed to prove they have suffered actual loss even though the tax benefits promised in the prospectus may not materialize." *Feldman, supra,* 606 F.Supp. at 924 (footnote omitted).

the propriety of the District Court's determination that the Oklahoma state law provided that a final probate court order barred the plaintiffs from asserting their claims against The Estate of Harris in this litigation.

Accordingly, the Judgment of the District Court is AFFIRMED.